BEAUFORT CTY. BD. OF EDUC. v. BEAUFORT CTY. BD. OF COMM'RS

[363 N.C. 500 (2009)]

BEAUFORT COUNTY BOARD OF EDUCATION v. BEAUFORT COUNTY BOARD
OF COMMISSIONERS

No. 106PA08

(Filed 28 August 2009)

**1. Schools and Education— funding—dispute with county— resolution by court—constitutionality**

N.C.G.S. § 115C-431 (which provides an eventual judicial resolution of disputes between school boards and county commissioners over the amounted needed to operate the school system) does not impermissibly delegate legislative authority and is constitutional. The statute does no more than invite the courts to adjudicate a disputed fact: the annual cost of providing a countywide system of education under the policies chosen by the legislature and the State Board of Education. This is within the historic and proper role of the judiciary.

**2. Schools and Education— funding—judicial determination of minimum—county authority not infringed**

N.C.G.S. § 115C-431 does not deprive the county commissioners of funding discretion granted by the State Constitution. The requirement that the commissioners provide the minimum level of funding required by state law does not abrogate their discretionary authority to contribute more.

**3. Schools and Education— funding—judicial resolution of disputed amount—jury instruction**

The Supreme Court exercised its general supervisory authority to promptly resolve a novel issue of great import, despite the lack of an objection or assignment of error, in a case involving the amount needed to operate a county school system. The instruction given to the jury on the word "needed" was too expansive, and was remanded for application of the more restrictive definition articulated herein.

**4. Schools and Education— funding—responsibility for operating expenses**

The statutes concerning school funding explicitly contemplate the funding of current school expenses by county commissioners when state funding is insufficient rather than local governments having responsibility for capital expenses only.

**5. Schools and Education— funding—judicial dispute—denial of continuance—not a denial of due process**

A county claiming a due process violation in a school funding case for the denial of a continuance had ample opportunity to communicate with the board of education and to request information, and the trial court did not err by denying the motion for a continuance. The legislature intended that the statutory process for resolving school funding disputes be carried out promptly.

Justice NEWBY concurring.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joins in the dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 188 N.C. App. 399, 656 S.E.2d 296 (2008), finding no error in a judgment entered 9 August 2006 by Judge William C. Griffin, Jr. in Superior Court, Beaufort County. Heard in the Supreme Court 9 September 2008.

*Schwartz & Shaw, P.L.L.C., by Brian C. Shaw and Richard Schwartz, for plaintiff-appellee.*

*Garris Neil Yarborough and Jonathan V. Maxwell for defendant-appellant.*

*James B. Blackburn, III, General Counsel, for North Carolina Association of County Commissioners, amicus curiae.*

*Tharrington Smith, L.L.P., by Ann Majestic and Robert M. Kennedy Jr.; and Allison B. Schafer, General Counsel, for North Carolina School Boards Association, amicus curiae.*

MARTIN, Justice.

This action arises out of a dispute between the Beaufort County Board of Education (the School Board) and the Beaufort County Commissioners (the County Commission) over the amount of funding necessary to operate the local school system for the 2006-2007 fiscal year (FY 2006-2007). The School Board requested $12,106,304 and the County Commission allocated $9,434,217. After complying with the negotiation and mediation procedures set forth in N.C.G.S. § 115C-431 (2007) (section 431), the School Board sued the County

Commission.[1] At trial, a jury found that the School Board needed $10,200,000 for FY 2006-2007 school operations. The trial court entered a judgment requiring the County Commission to appropriate that amount to the School Board.

On appeal, the Court of Appeals found no error. *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 188 N.C. App. 399, 416, 656 S.E.2d 296, 307 (2008). We allowed discretionary review to determine whether "the statutory framework for resolving school funding disputes between the county board of education and the county board of commissioners [is] constitutional" and, if so, whether "the statutory framework [has] been properly applied in this case."

[1] The County Commission first contends that section 431 is unconstitutional on its face. We observe that a facial challenge to a statute is a " 'most difficult challenge to mount successfully.' " *State v. Bryant*, 359 N.C. 554, 564, 614 S.E.2d 479, 485 (2005) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). A party must show that there are no circumstances under which the statute might be constitutional. *See id.* at 564, 614 S.E.2d at 486. We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them. *See Henry v. Edmisten*, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986). This Court will only measure the balance struck in the statute against the minimum standards required by the constitution. *See id.*

The County Commission alleges that by allowing the court system to play a role in deciding the level of funding for public education, section 431(c) impermissibly delegates the legislature's constitutional duty to "provide . . . for a general and uniform system of free public schools." N.C. Const. art. IX, § 2(1). The County Commission argues that the statutory procedure in section 431(c) thus violates the constitutional requirement that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." *Id.* art. I, § 6. Like the United States Supreme Court, however, we acknowledge that our separation of powers clause does not prevent the General Assembly "from seeking assistance, within proper limits, from its coordinate Branches."

---

1. Section 431(c) allows school boards to sue county commissions when other resolution procedures fail. At trial, the court, via a jury if either party so requests, "find[s] the facts as to the amount of money necessary to maintain a system of free public schools, and the amount of money needed from the county to make up this total." *Id.*

*Touby v. United States*, 500 U.S. 160, 165 (1991) (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

In analyzing the role of the judiciary under section 431(c), we begin by examining the statutory procedures preceding litigation. The local school board first creates a budget setting out its estimate of the cost of providing education within its locale for the upcoming year and submits that budget to the county commission. *See* N.C.G.S. § 115C-429(a) (2007). The county commission then determines the amount of funds to be appropriated to the school board. *See* N.C.G.S. § 115C-429(b) (2007). If there is a dispute between the school board and the county commission, the two boards meet with a mediator in an effort to negotiate a compromise. *See* § 115C-431(a). If there is still no agreement, representatives from the two boards enter a formal mediation. *See* § 115C-431(b). If no agreement can be reached at the mediation, the school board may file an action in superior court. *See* § 115C-431(c). In any such action, the trial court is charged to

> find the facts as to the amount of money necessary to maintain a system of free public schools, and the amount of money needed from the county to make up this total. . . .
>
> . . . When the facts have been found, the court shall give judgment ordering the board of county commissioners to appropriate a sum certain to the local school administrative unit, and to levy such taxes on property as may be necessary to make up this sum when added to other revenues available for the purpose.

*Id.*

Because the trial court must determine the amount necessary to fund "a system of free public schools," *id.*, we look to other provisions of Chapter 115C to determine the meaning of that phrase. The Chapter contains copious provisions setting standards, often in minute detail, to which local schools must adhere.[2] The State Board

---

2. For a mere partial listing, see, for example, N.C.G.S. §§ 115C-81(a1) (mandating that the Basic Education Program adopted by the State Board be offered to every child); 115C-81(a3)(1) (mandating availability of alcohol and drug use prevention programs); 115C-81(b1) (requiring two full years of instruction on North Carolina history and geography); 115C-81(g) (requiring that the major principles of the nation's founding documents be taught); 115C-81(h) (requiring instruction in character traits of courage, good judgment, integrity, kindness, perseverance, respect, responsibility, and self-discipline); 115C-84.2 (mandating calendar); 115C-102.6C (mandating technology plan in accord with State Board's plan); 115C-166 (requiring industrial-quality eye protection while participating in certain activities); 115C-216 (requiring a course of training in the operation of motor vehicles); 115C-245(a) (prescribing minimum qualifica-

of Education (the State Board) is given the general administrative and supervisory role over public education and is responsible for "establish[ing] policy for the system of free public schools." N.C.G.S. § 115C-12 (2007).[3] The statutory provisions enacted by the legislature and guidelines adopted by the State Board, when viewed together, comprehensively define the phrase "a system of free public schools" used in section 431(c).

Since the General Assembly has so exhaustively defined its desired system, the section 431(c) procedure does no more than invite the courts to adjudicate a disputed fact: the annual cost of providing a countywide system of education under the policies chosen by the legislature and the State Board. Such fact-finding falls within the historic and proper role of the judiciary. *See, e.g.,* N.C. Const. art. IV, § 13 (discussing civil actions: "[T]here shall be a right to have issues of fact tried before a jury."). After finding the facts, the trial court enters judgment against the county commission as directed by the legislature. *See* § 115C-431(c). It is the legislature, not the judiciary, which has assigned responsibility to local government by requiring that judgment be entered against the county commission if the court finds the cost of schooling is greater than the amount appropriated. The legislature has therefore neither assigned policy-making power to the courts nor otherwise delegated its authority, and the judiciary is at all times exercising a function traditionally assigned to it under our tripartite system of government.

Furthermore, we have previously considered and upheld a provision nearly identical to section 431(c). Chapter 33, section 8, Laws of 1913, provided, just as section 431 does, for judicial fact-finding as to the cost of schools in the event of disagreement between a county school board and the county commission. *See* Act of Mar. 1, 1913, ch. 33, sec. 8, 1913 N.C. Pub. [Sess.] Laws 58, 60. As in this case, the

---

tions for school bus drivers); 115C-264 to -264.3 (governing provision of food service, including a decrease in foods high in trans-fatty acids, restrictions on vending machine sales, and a preference for high-calcium foods and beverages); 115C-301 (governing allowable class sizes); 115C-364 (setting minimum age for admission); 115C-375.4 (2007) (requiring that parents be informed about meningococcal meningitis and influenza vaccines annually).

3. To list only a few examples from that section, the duties assigned to the State Board include setting policy regarding the following areas: regulation of salaries, adoption of textbooks, adoption of rules requiring implementation of the Basic Education Program (defined elsewhere), development and enforcement of the School-Based Management and Accountability Program, development of content standards and exit standards, promulgation of transportation regulations, and adoption of model guidelines for closing the academic achievement gap. *See* § 115C-12(9), (9c), (16), (17), (30).

county commission challenged the resolution scheme as unconstitutional. *See Bd. of Educ. v. Bd. of Cty. Comm'rs*, 174 N.C. 469, 474, 93 S.E. 1001, 1003 (1917). In response to that argument, we held, just as we do now, that the scheme "only empowers the courts to ascertain and determine a disputed fact relevant to a pending issue between the two boards, and thereupon command that the tax be levied accordingly, both the finding of the fact and the judgment thereon being, in our opinion, judicial in their nature." *Id.* The provisions of section 431(c) thus comport with the State Constitution, and any complaints about the policy or wisdom of the challenged procedures must necessarily be directed to the General Assembly.

[2] The County Commission next asserts that section 431(c) deprives it of funding discretion granted by the State Constitution. Our Constitution provides:

> (2) *Local responsibility.* The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.

N.C. Const. art. IX, § 2(2). The County Commission maintains that allowing the court to ascertain "the amount of money necessary to maintain a system of free public schools," § 115C-431(c), is counter to the second sentence of the constitutional provision, which states that the local government "may . . . *add to or supplement*" the amount for which the legislature has assigned responsibility, N.C. Const. art. IX, § 2(2) (emphasis added).

In interpreting our Constitution, we are bound to "give effect to the intent of the framers of the organic law and of the people adopting it." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953). Moreover, "where one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted." *In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977) (citations omitted).

We now consider the meaning of the terms "necessary" and "needed," as used in section 431(c), in light of Article IX, Section 2(2) of the State Constitution. We acknowledge that these terms are susceptible to reasonable interpretations of varying strictness, about

which there has been argument from the earliest days of our republic. *See, e.g.*, *M'Culloch v. Maryland*, 17 U.S. 207, 212-13, 4 Wheat. 316, 323-25 (1819). If a fact-finder were to interpret "necessary" or "needed" in section 431(c) expansively, there is a danger that the resulting verdict could intrude on a county commission's funding discretion under Article IX, Section 2(2) by requiring the appropriation of a greater amount of money than that for which the legislature has assigned responsibility. Accordingly, in order to reconcile the statute with Article IX, Section 2(2), we accord a restrictive interpretation to the terms "necessary" and "needed" within section 431(c).

So construed, section 431(c)'s requirement that county commissions provide the minimum level of funding required by state law does not abrogate their discretionary authority to contribute more. As discussed above, the legislature has deemed it appropriate to assign responsibility to local government to provide funding to maintain the system of public schools. County commissions are thus required to furnish that amount. *See* N.C. Const. art. IX, § 2(2). Our State Constitution protects a local government's discretionary authority to provide more funding than legally required, not less. Consequently, section 431(c) does not encroach on local governments' discretion to contribute additional funds to schools beyond their minimum legal responsibility.

**[3]** We next consider the trial court's charge to the jury in the present case. Although counsel did not object or assign error to the trial court's instructions, " '[t]his Court will not hesitate to exercise its rarely used general supervisory authority when necessary to promote the expeditious administration of justice,' and may do so to 'consider questions which are not properly presented according to [its] rules.' " *State v. Ellis*, 361 N.C. 200, 205, 639 S.E.2d 425, 428 (2007) (quoting *State v. Stanley*, 288 N.C. 19, 26, 215 S.E.2d 589, 594 (1975)). We invoke our general supervisory authority mindful that because the trial court "did not have the legal standard which we articulate today to guide him in his consideration of the case, . . . it is not reasonable to expect him to have applied it without the benefit of this opinion." *State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *cert. denied*, 476 U.S. 1165 (1986). The instant case is analogous to other situations wherein this Court has invoked its general supervisory authority to promptly resolve a novel issue of great import. *See In re Brownlee*, 301 N.C. 532, 548, 272 S.E.2d 861, 870 (1981) (stating that the Court's general supervisory authority may be invoked when "[t]he novelty of the issues presented, coupled with

the *potential liability of the counties of North Carolina*, serves to emphasize the proper role of the judiciary in securing a prompt resolution" (emphasis added)).

The trial court instructed the jury that the word "needed" in section 431(c) means "that which is reasonable and useful and proper or conducive to the end sought." Rather than conveying a restrictive definition of "needed," which is necessary to preserve the discretionary authority of county commissions under Article IX, Section 2(2), the instruction conveyed an impermissible, expansive definition of this statutory term. Because the instruction was in error, we must remand for a new trial. At that trial, the trial court should instruct the jury that section 431(c) requires the County Commission to provide that appropriation legally necessary to support a system of free public schools, as defined by Chapter 115C and the policies of the State Board. The trial court should also instruct the jury, in arriving at its verdict, to consider the educational goals and policies of the state, the budgetary request of the local board of education, the financial resources of the county, and the fiscal policies of the board of county commissioners. *See* N.C.G.S. § 115C-426(e) (2007). Anything beyond this measure of damages impermissibly infringes upon the discretionary authority of the County Commission under Article IX, Section 2(2) of the State Constitution and may not be awarded by a jury.

**[4]** The County Commission next asserts that the trial court erred in its interpretation of the statutory framework. Specifically, the Commission alleges that the legislature has assigned to local governments responsibility only for capital expenses and not current expenses. The statutes explicitly contemplate the funding of current expenses by county commissions when state funding is insufficient. *See, e.g.*, § 115C-426(e) (stating that the local current expense fund shall include appropriations sufficient, when added to state funds, to conform to the educational goals of the state; and stating that these appropriations shall be funded by, among other sources, "moneys made available to the local school administrative unit by the board of county commissioners"). Moreover, as we have already discussed, section 431(c) itself assigns to the local government responsibility for funding "a system of free public schools," not merely the capital expense component. We therefore reject the argument that the General Assembly has not assigned responsibility for current expenses to local governments.

**[5]** Finally, the County Commission alleges that its due process rights were violated by the trial court's denial of its motion to continue. The legislature intended that the statutory resolution process be carried out promptly. *See* § 115C-431(c) ("When a jury trial is demanded, the cause shall be set for the first succeeding term of the superior court in the county, and shall take precedence over all other business of the court."). Assuming, without deciding, that the County Commission is a "person" for due process purposes, it had ample opportunity to communicate with and request information from the School Board after its budget proposal was submitted, including the time during which the boards were engaged in negotiation and mediation leading to the instant suit. *See* N.C.G.S. § 115C-429(c) (2007) ("The board of county commissioners shall have full authority to call for . . . all books, records, audit reports, and other information bearing on the financial operation of the local school administrative unit."); § 115C-431(a), (b). Therefore, the trial court did not err by denying the motion to continue.

In sum, we reject the County Commission's facial challenge and uphold section 431(c) as constitutional. Nonetheless, because the trial court's instructions invited the jury to step beyond its role of determining necessary funding and intrude upon the County Commission's constitutional discretion, we reverse the decision of the Court of Appeals and remand to that court for further remand to the trial court for a new trial.

REVERSED AND REMANDED.

Justice NEWBY concurring.

I agree with the majority that N.C.G.S. § 115C-431(c) can be read narrowly such that it withstands a facial challenge based on Article IX, Section 2 of the North Carolina Constitution. I also agree that, in order to ensure section 115C-431(c) is applied in a constitutional manner, limiting jury instructions are necessary in suits brought under that provision. I write separately because, although this case does not appear to present any constitutional violations, the paramount importance of educational funding compels me to address the interplay between section 115C-431 and the General Assembly's constitutional duty to ensure equal opportunities for a sound basic education for all of North Carolina's public school students.

The right to education is safeguarded in our State Constitution. Article I, Section 15 of the North Carolina Constitution establishes:

"The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." Our Constitution goes on to require: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged." N.C. Const. art. IX, § 1. Article IX, Section 2 of our Constitution, which is entitled "Uniform system of schools," provides:

> (1) *General and uniform system: term.* The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.

> (2) *Local responsibility.* The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.

By its plain language, Section 2(1) imposes solely on the General Assembly the duty to provide for the State's "uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." In *Leandro v. State*, we concluded that this subsection "requires that access to a sound basic education be provided *equally in every school district.*" 346 N.C. 336, 349, 488 S.E.2d 249, 256 (1997) (emphasis added). In so doing, we noted that the requirement of equal opportunities for all public school students is part of the General Assembly's constitutional duty to provide for the public schools. *Id.* at 348, 488 S.E.2d at 255.

The first sentence of Section 2(2) enables the General Assembly to require units of local government to bear some of the cost of maintaining their local public schools. However, no school budget "may be funded in such a fashion that it fails to provide the resources required to provide the opportunity for a sound basic education." *Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 634, 599 S.E.2d 365, 388 (2004).

The second sentence of Section 2(2) permits local governing boards, if they so choose, to use local revenues to exceed the educational financing requirements placed on them by the General Assembly.

Because the North Carolina Constitution expressly states that units of local governments with financial responsibility for public education may provide additional funding to supplement the educational programs provided by the state, there can be nothing unconstitutional about their doing so or in any inequality of opportunity occurring as a result.

*Leandro*, 346 N.C. at 349-50, 488 S.E.2d at 256.

Read together, the North Carolina Constitution and this Court's opinions in *Leandro* and *Hoke County* lead to the conclusion that, while the General Assembly may require local governments to contribute to the cost of maintaining their local public schools, and the local governments may choose to exceed that basic cost by contributing more than the General Assembly requires, the minimum definition of a sound basic education must be the same throughout the state. Along with the minimum substantive requirements of a sound basic education, *see id.* at 347, 488 S.E.2d at 255, there must be a corresponding minimum level of funding that is required for every student. While the legislature may delegate the authority to establish educational funding levels, it may not do so in a manner that allows the per-student financial aspect of a sound basic education to vary substantially by county. Otherwise the General Assembly will have unconstitutionally abdicated its duty to ensure "equal opportunities . . . for all students." N.C. Const. art. IX, § 2(1).

The General Assembly has codified the responsibilities for educational funding in section 115C-426 of the General Statutes, entitled "Uniform budget format." Three funds are identified: the State Public School Fund, the local current expense fund, and the capital outlay fund. N.C.G.S. § 115C-426(c) (2007). The State Public School Fund includes "appropriations for the current operating expenses of the public school system from moneys made available to the local school administrative unit by the State Board of Education." *Id.* § 115C-426(d) (2007). The capital outlay fund is used for facilities and capital improvements. *Id.* § 115C-426(f) (2007).

The parties to this case stipulated at trial that the only issue in controversy is the portion of the county's education budget known as the local current expense fund. Section 115C-426(e) defines this fund as follows:

The local current expense fund shall include appropriations sufficient, when added to appropriations from the State Public

> School Fund, for the current operating expense of the public school system in conformity with the educational goals and policies of the State and the local board of education, within the financial resources and consistent with the fiscal policies of the board of county commissioners.

*Id.* § 115C-426(e) (2007). This provision must be read in light of Article IX, Section 2 of the North Carolina Constitution and our holdings in *Leandro* and *Hoke County*. Thus, at a minimum, the funding must be sufficient to provide a sound basic education. Likewise, the funding cannot interfere with the discretion of the local governing board to provide additional educational funding as established by Article IX, Section 2(2). Between these parameters, the statute envisions an amount,

> when added to appropriations from the State Public School Fund, for the current operating expense of the public school system in conformity with the educational goals and policies of the State and the local board of education, within the financial resources and consistent with the fiscal policies of the board of county commissioners.

*Id.* This is referred to in section 115C-431(c) as the "amount of money . . . needed from sources under the control of the board of county commissioners to maintain a system of free public schools." N.C.G.S. § 115C-431(c) (2007). It is this amount which is in controversy.

The counties' discretion under Article IX, Section 2(2) regarding whether (and by how much) to exceed the funding responsibility assigned to them by the State belongs to the counties alone, and the General Assembly cannot delegate that discretion away from "[t]he governing boards of units of local government with financial responsibility for public education." N.C. Const. art. IX, § 2(2). I therefore agree with the majority opinion's conclusion that, in a suit under N.C.G.S. § 115C-431(c), the fact finder may only determine the amount of funding that is statutorily required and may not decide the amount of discretionary county funding. As noted by the majority, in this case, the court must instruct the jury that the amount of money "needed from sources under the control of the board of county commissioners to maintain a system of free public schools," N.C.G.S. § 115C-431(c), is only the amount necessary to fulfill "the educational goals and policies of the State" as they are set forth in Chapter 115C. *Id.* § 115C-426(e).

Unlike the majority, I believe that even when the statutes are read narrowly, resolving a dispute under section 115C-426(e) through the procedure of section 115C-431(c) still raises constitutional concerns. Under the statutes, the many factors to be considered in reaching a funding decision include "the educational goals and policies of the State," "the educational goals and policies of . . . the local board of education," and "the financial resources and . . . fiscal policies of the board of county commissioners." *Id.* It concerns me that requiring judicial actors to weigh such policy considerations may be at odds with our Constitution's requirement that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Similarly, I worry that section 115C-431(c) requires the courts to address nonjusticiable political questions. *See Bacon v. Lee,* 353 N.C. 696, 717, 549 S.E.2d 840, 854, *cert. denied,* 533 U.S. 975, 122 S. Ct. 22, 150 L. Ed. 2d 804 (2001). The majority opinion maintains that section 115C-431(c) has not "assigned policy-making power to the courts," but I believe the determination of the amount of funding needed to support the public school system is fraught with political implications. Budgetary decisions by nature reflect policy considerations. Local priorities can shift over time, and those priorities are sure to affect the funding decisions of local governments and courts, especially when jury trial is available. If the constitutional guarantee of a sound basic education is to be realized throughout North Carolina, the funding decision should be left to a body like the General Assembly, which is in the best position to consider the full range of evidence and balance the competing objectives.

I acknowledge, however, that this Court has held it permissible for the General Assembly to delegate to the courts the task of determining school funding levels. In *Board of Education v. Board of County Commissioners,* this Court upheld a law that required the superior court division to resolve disputes regarding the amount of tax needed to be levied to maintain a county's public schools for a four month period. 174 N.C. 469, 474, 93 S.E. 1001, 1003 (1917). In accordance with the principle of stare decisis, I adhere to this precedent despite my strong reservations about courts' ability to properly address the myriad policy considerations that attend educational funding.

I am also concerned that the extent of discretion assigned to the counties under section 115C-431 leaves open the possibility that counties could establish educational funding at a level below that

which is required to provide a sound basic education. To be sure, the General Assembly has to a large extent acknowledged its duty to ensure that all public school students receive an equally sound basic education. Section 115C-408(b) of the General Statutes provides in pertinent part:

> To insure a quality education for every child in North Carolina, and to assure that the necessary resources are provided, it is the policy of the State of North Carolina to provide from State revenue sources the instructional expenses for current operations of the public school system as defined in the standard course of study.

> It is the policy of the State of North Carolina that the facilities requirements for a public education system will be met by county governments.

N.C.G.S. § 115C-408(b) (2007). These statements of policy recognize the significant variations in the counties' educational needs (due to differences in population, for example) and that those variations will be most manifest in the counties' "facilities requirements." *Id.* The General Assembly has therefore expressed a preference to permit the counties to tend to their capital needs as their individual circumstances dictate. "[T]he instructional expenses for current operations of the public school system," meanwhile, should be substantially equal on a per-student basis, especially since all students are provided the same "standard course of study." *Id.* Thus, by opting against county-based funding of instructional expenses for current operations in order "[t]o insure a quality education for every child in North Carolina," this statute underscores the constitutional policy that a sound basic education should be funded equally throughout the State. *Id.* The only reason adherence to that policy might not be fully ensured is that the lack of a statewide determination of the amount needed for a sound basic education potentially enables the counties to fund public education below the constitutionally required level. While I recognize the possibility that such a statewide determination is already being made, the record before the Court does not reflect that this is the case.

In summation, I believe the natural consequence of the General Assembly's constitutional duty to ensure an equally sound basic education for all public school students in North Carolina is a need for a statewide determination of the amount of money that must be expended per student to achieve that constitutional minimum. I fur-

ther believe N.C.G.S. § 115C-431 delegates discretion over educational funding in a manner that does not fully guarantee adherence to the constitutional mandate that "equal opportunities shall be provided for all students" across our state. N.C. Const. art. IX, § 2(1). Although this particular case does not appear to present any violations of that mandate, I believe the funding of our public schools is important enough to warrant consideration of this issue. Within the context of the instant case, while I believe that a court of law is not the proper mechanism for resolving the political questions associated with educational funding, stare decisis constrains me to concur with the majority.

Justice HUDSON dissenting.

I agree entirely with the bulk of the reasoning and analysis outlined in the majority opinion and particularly with its conclusion that N.C.G.S. § 115C-431(c) is constitutional on its face. However, I would decline to revisit the trial court's charge to the jury, an issue to which the majority concedes that "counsel did not object or assign error." There is no showing in the record or briefs before us that N.C.G.S. § 115C-431(c) was *not* properly applied in this case. For that reason, I would affirm the Court of Appeals decision finding no error in the trial court's entry of judgment based upon the jury's verdict. As such, I respectfully dissent.

In our order allowing the County Commission's petition for discretionary review, we specifically limited our review to whether "the statutory framework for resolving school funding disputes between the county board of education and the county board of commissioners [is] constitutional," and, if so, whether it was properly applied in this case. Likewise, as noted by the County Commission in its brief to this Court, "Legal error is presented; the relevant facts are not disputed." None of the arguments presented on appeal—before the Court of Appeals or this Court, by the County Commission, the School Board, or any of the amici curiae who submitted briefs—challenged, contested, or otherwise found fault with either the trial court's instructions to the jury or with the "amount of money necessary to maintain a system of free public schools" in Beaufort County, as determined by the jury. The *sole* basis of the appeal was the constitutionality of section 115C-431(c), both facially and as applied.

I recognize that this Court does have "rarely used general supervisory authority" to "consider questions which are not properly presented according to our rules." *State v. Stanley*, 288 N.C. 19, 26,

215 S.E.2d 589, 594 (1975) (citations omitted); *compare Bailey v. State*, 353 N.C. 142, 158 n.2, 540 S.E.2d 313, 323 n.2 (2000) (recognizing the Court's "constitutional supervisory powers over inferior courts" but declining to exercise that authority to allow a nonparty's petition to be heard, as the issue presented was not an "exceptional circumstance," nor was the nonparty subjected to "financial obligations imposed by order of a trial court" as in other cases) *with In re Brownlee*, 301 N.C. 532, 547-48, 272 S.E.2d 861, 870-71 (1981) (electing to "treat the papers which have ben filed [sic] . . . as a motion calling upon the court to exercise its supervisory powers" and allow a county to appeal the order in a juvenile proceeding because of the county's "significant interest in the outcome," including possible future expenditures). However, I disagree that the trial court's instructions to the jury here constitute the type of "exceptional circumstance" that calls for such action.

As noted by the majority opinion, we "will not hesitate to exercise . . . [that] authority when necessary to promote the *expeditious* administration of justice." *Stanley*, 288 N.C. at 26, 215 S.E.2d at 594 (emphasis added). In *State v. Ellis*, we exercised the authority to review a Court of Appeals decision on a motion for appropriate relief in a noncapital case, finding that such action "to review upon appeal any decision of the courts below," N.C. Const. art. IV, § 12, was "particularly appropriate when . . . *prompt and definitive resolution* of an issue is necessary to ensure the uniform administration of North Carolina *criminal* statutes," 361 N.C. 200, 205, 639 S.E.2d 425, 428-29 (2007) (emphases added). Likewise, although the majority points to *In re Brownlee* as an analogous case presenting "a novel issue of great import," we invoked our authority in *Brownlee* to allow the county to be a party to an appeal from a judgment that compelled the county to spend tens of thousands of dollars even though it was not a party to the case. 301 N.C. at 548, 272 S.E.2d at 870. We did not, however, create the county's arguments for it; rather, we simply reviewed the arguments the county had already presented to the Court.

Here, by acting *ex mero motu* to consider the trial judge's instructions to the jury and, by extension, the amount of the award fixed by the jury, the majority acts contrary to our own admonition that "[i]t is not the role of the appellate courts . . . to create an appeal for an appellant," as doing so leaves "an appellee . . . without notice of the basis upon which an appellate court might rule." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) (per curiam)

(citation omitted); *see also Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 200, 657 S.E.2d 361, 366-67 (2008) (holding that one factor to consider with respect to noncompliance with appellate rules is "whether and to what extent review on the merits would frustrate the adversarial process" (citations omitted)). A thorough review of this record and the briefs and arguments presented by all parties to this appeal clearly illustrates that, not only has the County Commission never objected to either the trial judge's instructions to the jury or to the amount awarded by the jury, neither has the School Board ever articulated an argument in support of the same. To step in and set aside a jury verdict that has not been challenged is indeed to "frustrate the adversarial process" through this decision.

Moreover, while the majority maintains that the trial judge "did not have the legal standard which we articulate today to guide him in his consideration of the case," *State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 732 (1986), I disagree. In *McDowell*, a capital case, we undertook extensive analysis of existing case law to determine the proper standard on which to review the State's failure to disclose nonrequested evidence, noting that the disclosure requirement turned on the "materiality" of the evidence, a "somewhat elusive gauge" on which the leading United States Supreme Court case, *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342 (1976), was less than clear as to the meaning of the term, and silent as to whether the trial judge or the jury should decide the question. *McDowell*, 310 N.C. at 69-73, 310 S.E.2d at 306-09. Both defendant and the State focused their arguments on appeal on the materiality standard, and whether it was properly applied by the trial judge. After articulating in plain terms what the standard should be, we remanded to the trial court to reconsider defendant's motion for appropriate relief in light of that standard—one that had not previously existed in our case law. *Id.* at 75, 310 S.E.2d at 310.

By contrast, the legal standard applied by the trial judge here clearly existed at the time of the trial and jury verdict: the plain language of section 115C431(c) itself articulates the standard to determine "what amount of money is needed from sources under the control of the board of county commissioners to maintain a system of free public schools." Had the County Commission found the instructions to the jury on the definition of the word "needed" objectionable, the County Commission could have made that issue part of its "unconstitutional as applied" challenge to the statute. Instead, in its argu-

ments on appeal, the County Commission focused primarily on its facial challenge and relied on *Board of Education v. Board of County Commissioners*, 240 N.C. 118, 81 S.E.2d 256 (1954), a case that is inapposite to the issue presented here. Even more telling, the County Commission did not object to the jury instructions at trial and, under our appellate rules, thereby waived any objections. *See* N.C. R. App. P. 10(b)(2) ("A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection[.]").

There has been no showing by the County Commission or any other party that the amount awarded by the jury here was excessive or that it went beyond the restrictive definition of "needed" articulated in the majority opinion. Indeed, the amount awarded by the jury, $10,200,000, was ultimately less than the $12,106,304 requested by the School Board, and much closer to the $9,434,217 originally budgeted by the County Commission. This amount is not the type of "runaway verdict" that suggests the jury somehow overstepped its role, or disregarded the trial judge's instructions, but one indicating that the jury took seriously its responsibilities and awarded a seemingly reasonable figure that comports with the cost and expense projections presented by the parties at trial.

The County Commission failed to present any persuasive argument or evidence that section 115C-431(c) is unconstitutional as applied here, and this Court should not unilaterally act to create its case. *Viar*, 359 N.C. at 402, 610 S.E.2d at 361. In my view, the majority's decision to remand for a new trial unnecessarily delays and prolongs the dispute between the parties, already ongoing since the 2006-07 fiscal year, in a manner contrary to the stated purpose of invoking our general supervisory authority to contribute to "prompt and definitive resolution of an issue." *Ellis*, 361 N.C. at 205, 639 S.E.2d at 428-29. Perhaps even more significantly, this disposition runs entirely counter to the clear intention of the General Assembly that the statutory resolution process outlined in section 115C-431(c) be carried out promptly. *See* N.C.G.S. § 115C-431(c) (in addition to other provisions for an immediate hearing, specifying that, "When a jury trial is demanded, the cause shall be set for the first succeeding term of the superior court in the county, and shall take precedence over all other business of the court.").

This case does not present the type of "unusual [or] exceptional circumstance[]" in which we should invoke our "rarely used general

supervisory authority" to "consider questions which are not properly presented according to our rules." *Stanley*, 288 N.C. at 26, 215 S.E.2d at 594. Nor does setting aside the jury award address any important constitutional questions or otherwise "prevent manifest injustice to a party." N.C. R. App. P. 2; *see State v. Barden*, 356 N.C. 316, 332, 572 S.E.2d 108, 120 (2002) (invoking Rule 2 to "address defendant's contentions" "because these issues raise important constitutional questions in the context of a capital case), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003).

For these reasons, I would follow the majority opinion's rationale as to the facial constitutionality of N.C.G.S. § 15C-431(c) and further hold that the statute is constitutional as applied in this case. I would decline to suspend the rules and consider an argument not before us on appeal, and I would affirm in its entirety the Court of Appeals decision finding no error in the trial court's entry of judgment on the jury verdict. I respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.